No. 36,612

Ferrill Rusch, *Appellee* and *Cross-appellant,* v. Phillips Petroleum Company, Cities Service Oil Company, Phil-han Oil Company, Gulf Oil Corporation, G. W. Hinkle, Walter Innes, Jr., C. H. Hoult, D. E. Dunne, Jr., and H. N. Carver, *Appellants.*

(180 P. 2d 270)

. C. A. SPENCER, judge. Opinion filed May 3, 1947.

*Redmond S. Cole,* of Tulsa, Okla., argued the cause, *A. W. Hershberger, J. B. Patterson, Enos E. Hook,* all of Wichita, *Jerry E. Driscoll,* of Russell, *Don Emery, Rayburn L. Foster, R. B. F. Hummer, D. E. Hodges, A. M. Ebright* and *R. O. Mason,* all of Bartlesville, Okla., were with him on the briefs for the appellants.

*Clifford R. Holland,* of Russell, argued the cause, and *George W. Holland* and *Herbert N. Holland,* both of Russell, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action by a tenant to recover damages resulting from the alleged deprivation of the use of leased land and other damages resulting from the pollution of water.

The defendant corporations were: Phillips Petroleum Company, Cities Service Oil Company, Gulf Oil Corporation and Phil-Han Oil Company. These defendants will be referred to as the parties have designated them, to wit: "Phillips," "Gulf," "Cities Service" and "Phil-Han." We are advised the following individual defendants were owners of an interest in the Phil-Han lease: G. W. Hinkle, Walter Innes, Jr., C. H. Hoult, D. E. Dunne, Jr., and H. N. Carver. The Phil-Han and these individual defendants have been grouped together in the abstracts as "Phil-Han."

The jury failed to agree and was discharged. The defendant corporations appeal from the orders overruling their joint and several demurrers to plaintiff's evidence.

The action was filed February 1, 1944. The amended petition, in substance, alleged: Plaintiff had a written lease from August 1, 1941, to August 1, 1944, on two quarter sections of land in Russell

county; he used the land for farming and stock-raising purposes; 107 acres were in pasture land and about 150 acres were under cultivation for wheat farming and row crops; the land was fenced; the pasture land in particular was well supplied with water from numerous springs, ponds and creeks; there was an abundant supply of good, pure, wholesome water until approximately July 15, 1942; all of defendants' leases were being operated; the Gulf had an oil and gas lease on a quarter section of land adjacent to and immediately east of plaintiff's land and another lease on a quarter section to the north of plaintiff's west quarter; one quarter of land, however, lay between the plaintiff's west quarter and the last mentioned lease of the Gulf; Phillips had the lease on the quarter lying between and immediately north of plaintiff's west quarter; the Cities Service had a lease on the quarter lying immediately west of the Phillips quarter; the Phil-Han had a lease on the eighty acres immediately north of the Cities Service quarter; the result was leases of defendants were being operated to the east, north and northwest of land used by plaintiff; plaintiff's land was located in the immediate drainage district of defendants' oil leases; defendants produced large quantities of crude oil, base sediment, salt and salt water containing minerals which were placed in salt or slush ponds; defendants permitted the mineralized substances to escape and flow from their wells and slush ponds down and over plaintiff's land and into the fresh water strata lying underneath plaintiff's entire premises and into the springs, creeks and draws which ran from defendants' leased lands into plaintiff's land; the result was plaintiff's ponds, creeks and springs became impregnated and saturated with such mineralized substances; the land was made unproductive; plaintiff was unable to use his leased land from approximately July 15, 1942, to the present time; plaintiff's cattle drank the water before plaintiff knew it was polluted.

The amended petition, in substance, alleged the following damages:

(A) Loss of use of the water in his pasture for 2 years........... $1,600.00
(B) Shrinkage and loss of weight of 73 cattle from July 15, 1942, to November 1, 1942, at $25 per head...................... 1,825.00
(C) Work and labor in driving the cattle and hauling water..... 549.00
(D) Shrinkage in 80 head of cattle from June 1, 1943, to November 1, 1943, at $30 per head................................ 2,400.00
(E) Expenses incurred in drilling and equipping a water well..... 489.07

Total actual damages ................................... $6,863.07

The amended petition, in substance, further alleged: Defendants knew, or should have known, the damages which would result to plaintiff by reason of their acts; the damage resulted from defendants' operation of their leases in violation of G. S. 1935, 55-121; defendants' acts were in utter disregard of plaintiff's rights and plaintiff is entitled to punitive damages in the sum of $5,000.

Separate answers of defendants, substantially the same, denied all charges of negligence and, insofar as now material, asserted their leases were operated in the usual and customary manner and in the exercise of reasonable care in an effort to avoid the escape of the mineralized substances complained of; reasonable and proper reservoirs and other instrumentalities were maintained to prevent the escape of injurious substances from their leaseholds.

Appellee's reply is not set forth but we assume it was a general denial of new matter alleged in the answers.

When appellee rested appellants again moved that appellee be required to elect whether he would rely for recovery for damages to his leasehold estate, or for damages, if any, in an effort to provide water for his livestock. The motion was sustained and appellee elected to eliminate items (C) and (E) and proceeded to trial on the remaining items of damage.

Appellants also moved to have the court strike out all evidence of punitive damages and certain other testimony. It is not now seriously urged the testimony sought to be stricken was incompetent but rather that appellants' several demurrers should have been sustained as to both actual and punitive damages. We think the evidence involved was properly admitted.

In order to clarify certain factual matters it should be stated there was no evidence any of appellants' salt or slush ponds overflowed. There was evidence of seepage. There was no evidence, however, that any mineralized substances from appellants' oil wells or slush ponds flowed over the surface of appellants' premises and onto appellee's land. There were no creeks on appellee's land but there were low stretches of ground referred to as draws. Some of such draws ran from the north and some from the northwest of appellants' leasehold premises and onto the west quarter of appellee's land.

The pollution damages, if any, resulted from seepage from appellants' ponds into the substrata of the soil and through such strata into the springs and natural ponds located on appellee's land. There was evidence the soil on appellants' premises was of a loamy and

porous character. The general slope of the surface of the land was from the north to the south. There existed a slight ridge running north and south between the draw containing most of appellee's springs, ponds and water wells in the pasture and most of the appellants' slush ponds. Ponds, springs and water wells of appellee, as well as some water wells on the Brandenburg farm immediately north of appellee's west quarter, were located along the draw previously mentioned. They, too, were polluted with the exception of one water well far to the north.

Most of the oil wells had been drilled in 1938. Tremendous quantities of mineral substances, usually termed salt or chlorides in the record, had been put into appellants' slush ponds. There was evidence the water in an abandoned water well on the Cities Service lease showed 10,000 p. p. m. chlorides according to a test made in February, 1943, by John C. McFarland, geologist from the sanitation division of the state board of health. With respect to the manner in which such tests were made that witness stated:

"We take the specified amount of water and parts per million chlorides, and evaporate them out, then you have so much residue left, and this is the residue that would be left if you would evaporate that specified amount of water containing so many parts per million."

There was evidence by the same witness that: All of appellants' wells produced from the Arbuckle formation; the approximate parts of solids or chlorides in the Arbuckle water were 38,000 p. p. m.; based on the volume of salt water from the Arbuckle formation appellants would have placed into their respective slush ponds the following amounts of salt *daily* from 1938 to February 1, 1944: Cities Service, 1,500 pounds; Phillips, 2,000 pounds; Gulf-Reinhardt, 300 pounds; Gulf-Rusch, 500 pounds.

The testimony of a veterinarian was that any quantity of chlorides in excess of 5,000 p. p. m. was injurious to stock and the injury would increase in proportion to the added salt content.

A party by the name of Aylward was operating an oil and gas lease on the west quarter of the land leased by appellee. There was a producing well in the extreme southeast quarter of that quarter section. There had been a salt water pond in appellee's pasture to the north of the oil well. It was not in use in February, 1943, when the witness McFarland made his first examination of appellants' leases. It appears Aylward had probably drilled a salt water disposal well on his lease in 1942. Appellants, however, stress the

fact that the Aylward slush pond had been located on the highest elevation; that the witness McFarland had not been requested to make and had made no examination of the content or volume of salt water produced from the Aylward lease. We are not unmindful of those facts and probably the jury was not.

In what has been said we have not attempted to narrate numerous details contained in the oral testimony and exhibits before us. The entire record has received many hours of our attention. From such study we are forced to conclude that whether it reasonably could be inferred appellants were responsible for the pollution of appellee's springs, ponds and water wells and whether the extent, if any, to which appellants polluted the water was sufficient to cause injury to appellee's stock, were jury questions. In *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 106 P. 2d 652, a pollution case, we cited earlier cases and said:

"It may also be noted that appellees were not obliged to exclude every other possible source of pollution after establishing facts from which it reasonably could be inferred that appellants had polluted the stream. The fact that appellants polluted the stream could, of course, be shown by circumstantial evidence. Such evidence in a civil case in order to be sufficient to sustain a verdict need not rise to that degree of certainty which will exclude every reasonable conclusion other than that reached by the jury. (*Railroad Co. v. Perry*, 65 Kan. 792, 70 Pac. 876; *Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 86, 98 P. 2d 162; *Brown v. Clark*, 152 Kan. 274, 277, 103 P. 2d 907.) In other words, appellees having established a cause of action against appellants, it was thereafter not a prerequisite to recovery that it be shown appellants were the sole cause of the pollution. (*Sternbock v. Consolidated Gas Utilities Corp.*, supra, p. 87.)" (p. 523.)

Appellants contend there was no evidence of a chemical examination of the water in 1942. That is true. It was not imperative there should be proof of pollution by chemical analysis. (*Klassen v. Creamery Co.*, 160 Kan. 697, 706, 165 P. 2d 601.) There was evidence the water was tasted and found to be very salty in 1942 and that the stock would not drink it; that the stock drank some of the polluted water in 1943 and lost stated amounts in weight in both the years 1942 and 1943.

Appellants emphasize the fact appellee testified that in the year 1942 the cattle did not drink the water. They argue if the stock did not drink the water by reason of its polluted condition it was not injured by polluted water. True, the stock could not have been injured by polluted water it did not drink. It, however, does not follow its polluted condition was not the cause of injury. Stock

needs water and plenty of it. It certainly would be injured if it failed to get the needed supply of fresh water. We think the evidence sufficiently established a causal connection between the salt water from appellants' leases and the injury to appellee's stock to withstand a general demurrer. Appellants lean heavily upon *Williams v. Gulf Oil Corp.*, 152 Kan. 672, 107 P. 2d 680, and other similar cases. We adhere to what was there said. The Williams case was a jury case and the record failed utterly to support the finding of the jury. Even at this distance we can understand some of the reasons the jury may have failed to agree in the instant case. That, however, does not alter the fact it was its province to agree or disagree.

Appellants also contend (1) no proper measure of damages was established; and (2) a verdict cannot be based on pure speculation and conjecture. The principle stated in point (2) must, of course, be conceded. The question remaining is point (1). On it appellants direct our attention primarily to the alleged lack of evidence with respect to the proper measure of damages to the stock. Damage was also claimed to the leasehold estate by reason of the alleged loss of its use due to pollution of the water. The testimony was the damage for that item was $800 per year or $1,600 for both years, the rental value which appellee had been required to pay. Appellants point out appellee's evidence disclosed the stock was kept on the land during the grazing season. The fact remains there was evidence the use of the leasehold had been impaired. The jury was not obliged to believe the damage to the leasehold amounted to the entire $1,600. On demurrer we do not consider or weigh inconsistencies in the evidence attacked. (*Meneley v. Montgomery*, 145 Kan. 109, 64 P. 2d 550; *Robinson v. Short*, 148 Kan. 134, 79 P. 2d 903.) The demurrer went to appellee's evidence generally. We need, therefore, not determine whether a proper measure of damages was established with respect to every other item of damage claimed.

Appellants insist the evidence furnished no basis for punitive damages and their separate demurrers to the evidence on the issue of punitive damages should have been sustained.

It is true, as previously stated, there was no evidence the mineralized substance overflowed appellants' slush ponds or that it flowed over the surface of their premises onto the land used by appellee. Appellants contend that although the ground sloped generally from

the north to the south there was no evidence the water in the subsurface strata flowed in the same direction or that subsurface waters flowed from the west to the east of the ridge where most of appellee's springs, ponds and water wells were located. They further argue there was no evidence appellants had knowledge of such facts, if they existed. It is therefore contended the evidence failed to establish wanton or malicious conduct on their part.

We have previously indicated the amount of salt water and salt which was deposited daily in appellants' slush ponds from 1938 to February 1, 1944. Manifestly appellants were presumed to have knowledge of their own acts. Likewise they must have known of the loamy and porous character of the soil upon which their salt ponds were built and consequently that they would be subject to seepage. Appellants remind us there was no evidence with respect to the amount of salt the Phil-Han had placed in its salt water pond. There was, however, evidence all of appellants' wells produced from the Arbuckle formation and what the salt content of the Arbuckle water was. Appellants' complaint on this point, in view of the entire record, goes to the extent of damage rather than to the fact of damage.

We do not deem it necessary to narrate all of the testimony of the witness, John C. McFarland, state geologist, relative to his general investigation of appellants' salt water ponds in the early part of February, 1943, or concerning his conversations with various representatives of appellants between February and August, 1943, relative to the condition of their ponds. It is sufficient to make a brief general summary of some of his testimony which, in substance, was:

His preliminary investigation of the ponds in February, 1943, disclosed they were in poor condition; they were seeping; unless there had been seepage some of the slush ponds could not have handled the volume of salt water that was being put into them; he contacted responsible representatives of all appellants and informed them that, in his opinion, it was necessary for them to drill water disposal wells in order to properly handle the volume of salt water being produced; that their slush ponds were inadequate and useless in view of the seepage; he directed them to notify the state board of health with respect to their intentions of handling the salt water; he made later contacts and found the men in charge of the salt water disposal on the leases had received

no word from their superiors concerning any definite plan of action; he learned only that some of the appellants were said to be contacting the other operators in the local area and had hopes of putting in a combination disposal well with other operators; he received one letter from Phillips dated February 19, 1943, in which it was said:

"This is to advise that we will attempt to work out some means of disposal with the other operators in this area."

McFarland further, in substance, testified: Only the appellant, Gulf, drilled a salt water disposal well and it was drilled on only one of its leases which was immediately to the east of appellee's land; it was drilled in June, 1943.

G. S. 1935, 55-121, provides:

"It shall be unlawful for any person, having possession or control of any well drilled, or being drilled for oil or gas, either as contractor, owner, lessee, agent or manager, or in any other capacity, to permit salt water, oil or refuse from any such well, to escape upon the ground and flow away from the immediate vicinity of such well, and it shall be the duty of any such person to keep such salt water, oil or refuse safely confined in tanks, pipe lines or ponds, so as to prevent the escape thereof: *Provided, however,* That this act shall not be construed to apply to the escape of salt water, oil or refuse because of circumstances beyond the control of the person in the possession or control of such well and under circumstances which could not have been reasonably anticipated and guarded against."

G. S. 1935, 55-122, makes it a criminal offense to knowingly and willfully violate any provisions of the preceding statute.

It will be observed the statute does not merely prohibit the over-flow of slush ponds. It also makes it the duty of the persons mentioned therein ". . . to keep such salt water, oil or refuse safely confined in tanks, pipe lines or ponds, so as to prevent the escape thereof." The proviso portion of the statute indicates the circumstances under which the provisions of the statute shall not apply. Whether seepage from the ponds into the substrata of the soil reasonably could have been anticipated by appellants, in view of the character of the soil, and guarded against, presented a question for the jury under proper instructions. Only the demurrer to appellee's evidence, and not the instructions, is now before us.

In the Donley case, *supra,* we held:

"The fact an act is unlawful and subjects a person to criminal prosecution is not in itself sufficient to determine liability in exemplary damages, but generally the intentional doing of a wrongful act with full knowledge of its

character, and without cause or excuse, is malicious and warrants an award of exemplary damages." (Syl. ¶ 5.)

Able counsel for appellants direct our attention to certain portions of the record more favorable to their clients than those we have mentioned. There may be much merit in the evidence referred to but on demurrer we do not compare evidence. We examine the record only for the purpose of ascertaining whether there is substantial competent evidence to support the issue, or issues, involved. Upon studious consideration we think we would not be justified in taking the issue of punitive damages away from the jury.

This brings us to appellee's cross-appeal from three rulings of which he complains. Those rulings were: (1) The order requiring him to elect whether he would rely upon recovering damages to his leasehold estate, that is, the $1,600 rental he had paid for the years 1942 and 1943, or upon the damages for money expended in an effort to provide water for that estate; (2) the exclusion of testimony of a witness relative to purported tests of salt water he made in March, 1944, after the alleged damage by salt water in 1942 and 1943 and subsequent to the filing of this action; and (3) the refusal of a requested instruction to the jury.

Before considering the cross-appeal on its merits we are confronted with appellants' motion to dismiss that appeal. Appellants point out the jury failed to agree and was discharged and hence no verdict or judgment was rendered. They further contend: The rulings complained of by appellee, if erroneous, were trial errors; that in order to be reviewable a motion for a new trial was necessary; no motion for a new trial was filed and appellee is not entitled to be heard on his cross-appeal. Touching their contentions appellants cite various cases involving direct appeals from similar rulings prior to judgment and, after judgment, where such rulings were not presented by a motion for a new trial. They also cite cases involving cross-appeals decided prior to the adoption of the new cross-appeal statute in 1937. That statute, G. S. 1945 Supp. 60-3314, reads:

"When notice of appeal has been served in a case and the appellee desires to have a review of rulings and decisions of which he complains, he shall within twenty days after the notice of appeal is filed with the clerk of the trial court, give notice to the adverse party, or his attorney of record, of his cross-appeal and file the same with the clerk of the trial court, who shall forthwith forward a duly attested copy of it to the clerk of the supreme court."

It is not contended appellee failed to comply with the statutory procedure provided by the cross-appeal statute. The identical question now raised was squarely presented, insofar as exclusion of a plaintiff's evidence was concerned, in *Walker v. S. H. Kress & Co.*, 147 Kan. 48, 75 P. 2d 820, and we held:

"Where a jury is unable to agree and a mistrial is declared and a demurrer to plaintiff's evidence has been overruled, from which ruling the defendants appeal, the plaintiff is not precluded from having a review on a cross-appeal, of orders excluding testimony simply because she filed no motion for a new trial, when she has otherwise complied with the requirements of the statute for a cross-appeal." (Syl. ¶ 4.)

All contentions of appellants in the instant case in support of their motion to dismiss the cross-appeal were fully considered and treated in the course of the opinon in the Walker case and need not be repeated here. The principal appeal in the instant case is only from the order overruling appellants' demurrer to appellee's evidence. We think points (1) and (2) of the cross-appeal, involving rulings which preceded the order from which the principal appeal was taken and which might affect a ruling on the principal appeal, are reviewable provided they are properly in the record before us for review.

No order, verdict or final judgment in which instructions to the jury were involved is here for review. The order refusing the instruction requested by appellee is not reviewable.

The order requiring appellee to elect was, in our opinion, properly sustained. Appellee, of course, had the right to try his case on his own theory. It is not our function to indicate or suggest a different theory. He decided to sue for the sum of $1,600 as the total damage to his leasehold estate caused by pollution of the water. Having so decided he cannot recover that damage and also the items of expense involved in supplying the water to the leasehold estate. Appellee cites no authorities to the contrary.

Touching the excluded testimony the record does not reflect what the testimony of the witness actually would have been had he testified. All the record discloses is merely what appellee's counsel claimed the testimony of the witness would be. The witness might, or might not, have so testified. It often has been held such a proffer is insufficient to be reviewable. (*State v. Ball*, 110 Kan. 428, 432, 204 Pac. 701; *State, ex rel., v. Wright*, 140 Kan. 679, 683, 38 P. 2d 135; *Walker v. S. H. Kress & Co.*, supra, p. 56.) In the Walker case we held:

"In order for rulings excluding testimony to be reviewable, where there was no opportunity to present such testimony in support of a motion for a new trial, the record must nevertheless sufficiently disclose the testimony of the witness and the rulings thereon to enable the trial court and this court to properly pass thereon, and a mere general proffer by counsel to the court of what he hopes to prove by the witness is not sufficient." (Syl. ¶ 5.)

No reversible error is disclosed by appellee's cross-appeal and the order overruling appellants' joint and several demurrers to appellee's evidence is affirmed.