No. 54,357

Roy E. McAlister, *Appellant,* v. Atlantic Richfield Company, a corporation, successor to Sinclair Prairie Oil Company; Mobil Oil Corporation, successor to Magnolia Petroleum Corporation; Aladdin Petroleum Corporation; Westrans Petroleum, Inc., a corporation; J. S. Kantor, d/b/a Kantor Oil Company; and Southern States Oil Corporation, *Appellees.*

No. 54,358

Roy E. McAlister, *Appellant,* v. Marathon Oil Company, Inc., successor to Ohio Oil Company, Inc.; and Getty Oil Company, successor to Skelly Oil Company, Inc., *Appellees.*

(662 P.2d 1203)

Opinion filed April 29, 1983.

*Patrick L. Dougherty,* of Wichita, argued the cause and was on the briefs for the appellant.

*T. J. Carney,* of Turner & Boisseau, Chartered, of Great Bend, argued the cause, and *Joseph R. Ebbert,* of the same firm, was on the brief for Atlantic Richfield Company, appellee.

*Evan J. Olson,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause, and *Richard Jones,* of the same firm, was with him on the brief for Mobil Oil Corporation, appellee.

*William Sumner Scott,* of Pittsburg, Pennsylvania, argued the cause and was on the brief for Westrans Petroleum, Inc., appellee.

*Carl L. Wettig,* of Wichita, argued the cause and was on the brief for Aladdin Petroleum Corporation and J. S. Kantor, d/b/a Kantor Oil Company, appellees.

*Robert M. Siefkin* and *Susan L. Smith,* of Foulston, Siefkin, Powers & Eber-

hardt, of Wichita, argued the cause, and *Jerry G. Elliott,* of the same firm, was with her on the brief for Southern States Oil Corporation, appellee.

*Evan J. Olson,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause, and *Jeffrey R. Akins,* of Casper, Wyoming, was with him on the brief for Marathon Oil Company, Inc., appellee.

*R. Douglas Reagan,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause and was on the brief for Getty Oil Company, appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is an action for damages caused by alleged violations of the Oil Well Pollution Act, K.S.A. 55-121. The issues of liability and damages were bifurcated and the matter proceeded on the issue of liability only. Summary judgments were entered for each defendant; from the trial court's ruling this appeal results.

This is an appeal from an order granting summary judgment in case No. 54,357, and a motion to dismiss in case No. 54,358. Both cases arise out of the same factual situation and were filed by plaintiff McAlister, against various oil companies who had conducted or were conducting oil operations on or near plaintiff's land.

McAlister is the owner of three tracts of land in Harvey County, Kansas. Plaintiff purchased a two-acre tract of land in 1966 where the old Willis School is located; in 1967 he purchased an additional 80-acre tract adjacent to the Willis School tract; and in 1968 an additional 40 acres adjacent to the Willis School tract was purchased by the plaintiff. McAlister purchased the land to form a new agriculture business and to conduct experiments, knowing the area was situated in an oil-producing area. When the land was purchased there was an existing fresh water well on the Willis School tract that produced good water. McAlister determined that the existing well did not produce the volume of fresh water to supply his increasing needs. In February of 1970, McAlister had a new well drilled to the depth of 120 feet outside the schoolhouse. In the early part of 1974, McAlister noticed that the water in this well suddenly had developed an "extremely high chloride and salt content" which rendered the water unfit for any use. Plaintiff filed his first action in case No. 54,357. During discovery, plaintiff determined that additional oil companies may have contributed to the pollution of his fresh water well; therefore, he filed the second action. At a hearing conducted by the district court, the judge sustained the defend-

ants' motion for summary judgment in case No. 54,357 and motion to dismiss in case No. 54,358. Plaintiff has appealed both orders.

August 29, 1975, plaintiff filed his petition against five oil companies, Atlantic Richfield Company, successor to Sinclair Prairie Oil Company (Atlantic Richfield); Mobil Oil Corporation, successor to Magnolia Petroleum Corporation (Mobil); Aladdin Petroleum Corporation (Aladdin); Westrans Petroleum, Inc. (Westrans); J. S. Kantor d/b/a Kantor Oil Company (Kantor); and filed an amended petition on May 24, 1976, adding Southern States Oil Corporation (Southern). For some reason, plaintiff and his attorney had a parting of the way shortly after the petition was filed and plaintiff proceeded pro se. For the next several years, the parties conducted discovery. During 1981, each of the defendants filed motions for summary judgment which the trial court sustained. When sustaining each defendant's motion for summary judgment, the trial court found (1) there was no genuine issue as to any material fact and the party was entitled to judgment as a matter of law (K.S.A. 60-256[c]); (2) plaintiff had not established a causal connection to any of the defendants and the claims were based on nothing more than speculation and conjecture; and (3) K.S.A. 55-140 was not appropriate or applicable to the case. Other findings were made by the court in each order of summary judgment but will not be stated in the opinion since they are not material to the finding.

Plaintiff listed witnesses who were local residents that would testify to various salt water or oil tank leaks, leadline leaks, well leaks, tank battery leaks, breaks, surface spills, and various disposal ponds now existing or which had existed in the past and were now covered over. None of the local witnesses could testify which defendant or if any defendants' acts caused pollution to the plaintiff's water well.

Depositions were taken from four expert witnesses listed by the plaintiff.

(1) Ralph E. O'Connor, district geologist for the Kansas Department of Health and Environment: Mr. O'Connor had conducted extensive investigation of water wells within a several mile radius of plaintiff's Willis School well. From the investigation, O'Connor concluded that the salt water pollution was a result of the plaintiff's drilling his water well too deep, thereby

penetrating the salt laden waters present in the Permian zone underlying the equus beds. Other wells less than 120 feet in depth in the area produced fresh water. O'Connor also stated chemical analysis of the water from plaintiff's well indicated that the pollution of the well water was oil field derived.

(2) Dr. Ronald L. Wells, a consulting engineer and Director of General Laboratories in Hutchinson, and a graduate engineer from Colorado School of Mines, with training and past experience in engineering, chemistry and physics, and having taken college courses in geology, historical geology, crystallography, and mineralogy, conducted two analyses of plaintiff's well water. Dr. Wells was of the opinion that the contamination of plaintiff's water well was salt water brine from oil field production. Dr. Wells admitted he had no specific evidence of who contributed to the pollution of the plaintiff's water well. Dr. Wells was of the opinion that, if salt water brine was allowed to escape on the surface of sandy soil over the equus beds, it would percolate down into the equus bed. The escaping salt water brine would generally flow in one direction but also would fan out in several directions in the equus beds, contaminating the beds.

(3) John S. Fryberger, hydrogeologist and Vice President of Engineering Enterprises, Inc., and Richard Lewis, project hydrogeologist, filed a report. Based on tests of plaintiff's well water, they concluded that the salt water pollution in the water was from oil field production.

A field investigation encompassing an area of 25 square miles in the vicinity of the McAlister Willis School well determined the source of pollution of plaintiff's water well. The investigation, using Kansas Corporation Commission records and unpublished data, also involved interviewing local residents, measuring private wells, determining the configuration of the surface of the equus beds, and using aerial maps to determine the source of pollution of plaintiff's water well. The source of pollution was leachate from unlined ponds, seepage from improperly plugged wells, injection into shallow zones, poor maintenance of brine ponds, and leakage from leadlines and tanks conveying or holding brine water. Based on the time of operation, size of ponds, and length of salt water pipelines, they concluded the percentage of damage contributed by each defendant. Some of the information contained in the report indicated the defendants'

pollution, if any, could not yet affect plaintiff's water well due to the time necessary for the escaping pollutant to travel and affect plaintiff's well water.

(4) Robert Hecht-Nielsen: Hecht-Nielsen has a doctorate degree in mathematics and a bachelor of science degree from Arizona State University. Based on information supplied by the plaintiff, he prepared a report dated October 22, 1979. Using the information supplied, he devised a mathematical formula to determine the percentage of pollution contributed by each of the defendants. He admitted he was not prepared to prove the results of his determination.

Plaintiff brought the action for damages for the pollution of his fresh water well claiming defendants violated K.S.A. 55-121 and that there is evidence that the defendants allowed salt water brine to escape from their oil drilling operations.

Judgment was granted the defendants pursuant to K.S.A. 60-256(c), which provides in part:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue *as to any material fact* and that the moving party is entitled to a judgment as a matter of law." Emphasis supplied.

A motion for summary judgment may be granted *only* if the record before the court conclusively shows there remains no genuine issue of a *material fact* unresolved. *Hanks v. Riffe Constr. Co.,* 232 Kan. 800, 658 P.2d 1030 (1983); *Motors Insurance Corporation v. Richardson,* 220 Kan. 288, 552 P.2d 894 (1976); *Brown v. Wichita State University, P.E.C., Inc.,* 217 Kan. 661, 538 P.2d 713 (1975); *Kern v. Miller,* 216 Kan. 724, 533 P.2d 1244 (1975); *State Bank of Burden v. Augusta State Bank,* 207 Kan. 116, 483 P.2d 1068 (1971); *Lawrence v. Deemy,* 204 Kan. 299, 461 P.2d 770 (1969); *Brick v. City of Wichita,* 195 Kan. 206, 403 P.2d 964 (1965).

"A summary judgment proceeding is not a trial by affidavits, and the parties must always be afforded a trial when there is a good faith dispute over the facts. . . .

. . . .

"A mere surmise or belief, no matter how reasonably entertained, that a party cannot prevail upon a trial, will not justify refusing him his day in court." *Brick v. City of Wichita,* 195 Kan. at 211.

"Petitioner next complains that a question of material fact exists which precludes summary judgment. *If a question of material fact remains, then to grant*

*summary judgment is error." Hall v. Twin Caney Watershed Joint Dist. No. 34, 4* Kan. App. 2d 202, 204, 604 P.2d 63 (1979). Emphasis supplied.

The sole fact issue in this case is whether any or all of the defendants allowed salt water brine to seep from their oil field operations into plaintiff's water well. If there is a question remaining as to whether the seepage into the plaintiff's water well did occur as to a defendant, then, as to that defendant, summary judgment is in error. This action was initiated with plaintiff alleging that defendants violated K.S.A. 55-121.

K.S.A. 55-121, first enacted in 1921, provides in pertinent part:

"It shall be unlawful for any person, having possession or control of any well drilled, or being drilled for oil or gas, either as contractor, owner, lessee, agent or manager, or in any other capacity, to permit salt water . . . from any such well, *to escape by overflow, seepage or otherwise from the vicinity of such well,* and it shall be the duty of any such person to keep such salt water . . . confined in tanks, pipe lines or ponds, so as to prevent the escape thereof."

The statute goes on to provide that such escape of salt water does not violate the statute if it is because of circumstances beyond the operator's control or could not have been reasonably anticipated or guarded against; but that issue has not been raised by the defendants, and none of them have presented any evidence by experts or otherwise as to that issue.

If any of the defendants violated K.S.A. 55-121 and caused plaintiff's pollution, they are civilly liable to plaintiff. In *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, 180 P.2d 270 (1947), the plaintiff, a farmer, sued Phillips, Cities Service, Gulf, and Phil-Han, claiming pollution of his fresh water because of seepage from salt water disposal ponds. The court held, largely on the basis of chemical analysis showing that the salt water polluting plaintiff's water carried defendant's oil-bearing strata, that plaintiff's case should be submitted to the jury on circumstantial evidence. Further, the court held not only is the issue a jury question but that plaintiff need not disprove other oil operations did not cause his pollution.

"The pollution damages, if any, resulted from seepage from appellants' ponds into the substrata of the soil and through such strata into the springs and natural ponds located on appellee's land." 163 Kan. at 14.

The surface drainage in the *Rusch* case suggested that the water would drain toward plaintiff, but the subsurface contours

were not known. There was another party who had not been sued but who had a disposal pond that very well could have caused the pollution complained of by the plaintiff; however, the court held that the case should be submitted to a jury, stating:

" 'It may also be noted that appellees were not obliged to exclude every other possible source of pollution after establishing facts from which it reasonably could be inferred that appellants had polluted the stream. The fact that appellants polluted the stream could, of course, be shown by circumstantial evidence. Such evidence in a civil case in order to be sufficient to sustain a verdict need not rise to that degree of certainty which will exclude every reasonable conclusion other than that reached by the jury. . . . [I]t was thereafter not a prerequisite to recovery that it be shown appellants were the sole cause of the pollution.' " 163 Kan. at 16.

"It is not imperative there should be proof of pollution by chemical analysis . . . ." 163 Kan.. 11, Syl. ¶ 2.

"G.S. 1935, 55-121, commonly referred to as the oil well pollution statute, does not prohibit merely the flow of salt water, oil or refuse from oil and gas wells over the surface and away from the immediate vicinity of such wells but, subject to the proviso therein contained, requires such substances to be safely confined, in the manner designated, to prevent their escape." 163 Kan. 11, Syl. ¶ 4.

The plaintiff in this case need not show negligence, nor need he pinpoint what a particular defendant did or did not do to cause his pollution; this is not an issue. All he need prove is a violation of K.S.A. 55-121.

In *Polzin v. National Cooperative Refinery Ass'n*, 175 Kan. 531, 266 P.2d 293 (1954), a case involving pollution of fresh water caused by escape of salt water from a well in which salt water was forced, the court held that:

"The evidence disclosed community of wrongdoing and concurrent negligence. *In fact the burden did not rest on appellee to prove appellants' negligence. The statute makes it unlawful to permit saltwater, oil or refuse to escape. Appellants' only defense was to prove the escape thereof was beyond their control or that it could not have been reasonably anticipated and guarded against. (G.S. 1949, 55-121.)*" 175 Kan. at 536. Emphasis supplied.

All of the summary judgments granted in this case reflect in the journal entry filed March 11, 1982, that they are based upon a finding that plaintiff could not pinpoint what each defendant did wrong. Such a finding is not a proper or material basis for summary judgment in this case. Such a finding and conclusion is immaterial where plaintiff has pled and offered substantive proof of a violation of K.S.A. 55-121 by each of the defendants.

In *Reiserer v. Murfin*, 183 Kan. 597, 331 P.2d 313 (1958), a case

that involved an alleged pollution of plaintiff's fresh water well by salt water seeping through substrata, the court approved the ruling in *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, holding that whether the defendant caused plaintiff's pollution is a jury question and affirming that negligence of defendant need not be proved.

"Defendant's obligation, or duty, is set out in the statutes above quoted [K.S.A. 55-118, -121] and in a damage action under these statutes negligence does not have to be alleged as an element of the petition. In *Martin v. Shell Petroleum Corp.,* 133 Kan. 124, 299 Pac. 261, this court held that negligence did not have to be proved as an element in a damage action under 55-118. *It would therefore be a useless thing to require plaintiff to plead something in his petition that he did not have to prove by his evidence.*" *Reiserer v. Murfin,* 183 Kan. at 600. Emphasis supplied.

The case was bifurcated and, therefore, issues as to damages have not and should not now be of concern in the appeal. The only issue is whether there is any controverted evidence as to the defendants' violation of K.S.A. 55-121 by allowing salt water brine to seep into the ground and escape their control and whether the escape of the brine caused plaintiff's pollution.

There is eyewitness and aerial photographic evidence that brine escaped the control of each defendant. There is also evidence that the salt water that escaped polluted plaintiff's well. Dr. Wells was firmly of the opinion that the salt water in plaintiff's well, in August, 1974, tested over 5,000 parts per million sodium chloride, was from the oil field production. The witness O'Connor related that a sodium chloride ratio below six was indicative of oil field salt water and that plaintiff's water well tested 0.40, which was less than six. Dr. Wells was also of the opinion that all of the defendants caused plaintiff's pollution. Lewis and Fryberger concluded on the basis of field investigations, interviews with witnesses, and state documents and aerial photographs that each defendant had caused plaintiff's pollution. These facts and the locations of defendants' oil field operations relative to plaintiff's fresh water well require that the matter be submitted to a jury.

The trial court has weighed the testimony of the plaintiff's witnesses and determined their observations were of little value or were pure speculation and conjecture. In considering a motion for summary judgment, a trial court must give to a litigant against whom judgment is sought the benefit of all inferences

that may be drawn from the admitted facts under consideration. *Bowen v. Westerhaus*, 224 Kan. 42, 578 P.2d 1102 (1978). The court erred in granting defendants' motions for summary judgment.

The judgment of the district court in case No. 54,357 is reversed and remanded for a trial of the issues.

During discovery plaintiff determined that two additional oil companies, Marathon Oil Company, Inc., successor to Ohio Oil Company, Inc. (Marathon), and Skelly Oil Company, Inc., now merged into Getty Oil Company (Getty), have contributed to the pollution of his fresh water well. Marathon and Skelly had conducted oil operations in the 1930's and 1940's near the present water well. On May 20, 1981, plaintiff filed a motion to amend his petition in *McAlister v. Atlantic Richfield Co.*, by adding Marathon and Getty. The trial court ruled that the plaintiff could not amend because of the late date, but allowed the plaintiff to file a separate suit. On July 1, 1981, plaintiff filed his claim against Marathon and Getty, stating the same facts alleged in the original case. Getty filed an answer September 8, 1981, and a motion to dismiss on September 15, 1981. Marathon, prior to filing an answer, filed a motion to dismiss on September 8, 1981. Marathon and Getty each claimed that the statute of limitations, K.S.A. 60-515(a), barred plaintiff's action.

December 16, 1981, Marathon's and Getty's motions were heard by the court. The court ruled that more than two years after plaintiff was first damaged (1974), plaintiff filed his petition alleging that the damages were permanent in nature, and therefore plaintiff was barred by the two-year statute of limitations, K.S.A. 60-513(a); that Marathon's and Getty's last act that could have damaged plaintiff occurred more than ten years before plaintiff commenced this action; that assuming plaintiff's claims were true, his claims against Marathon and Getty are barred by the statute of limitations, K.S.A. 60-513(a) and (b).

Plaintiff, on January 8, 1982, filed a motion for a new trial. January 18, 1982, plaintiff filed a motion to amend his petition to claim the oil pollution damages were temporary in nature, therefore not barred by any statute of limitations.

March 11, 1982, the court heard motions in both cases filed by the plaintiff. At the hearing on the motions, all plaintiff's motions were overruled. April 7, 1982, plaintiff filed his notice of appeal

of the overruling of his motions for a new trial, for leave to amend his petition, for consolidation, and the court's order dismissing plaintiff's petition.

No discovery was conducted in this case. All parties to this action were familiar with discovery conducted in the companion case.

Plaintiff contends that his claim should not have been dismissed as barred by the statute of limitations where the action was filed for more than two years after plaintiff was first damaged but where plaintiff claimed temporary repeated damage to his business.

Temporary damages or continuing damages limit recovery for injury that is intermittent and occasional and the cause of the damages remediable, removable, or abatable. Damages are awarded on the theory that the cause of the injury may and will be terminated. Temporary damages are defined as damages to real estate which are recoverable from time to time as they occur from injury. 25 C.J.S., Damages § 2, p. 626.

Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury. Permanent damages are damages for the entire injury done — past, present and prospective — and generally speaking those which are practically irremediable. 25 C.J.S., Damages § 2, pp. 622-23. If an injury is permanent in character, all the damages caused thereby, whether past, present, or prospective, must be recovered in a single action.

Plaintiff claims a continuing wrong each time the salt water pollutants trespass onto his subsurface water. Marathon and Getty maintained oil operations that continue to allow salt brine into the equus beds, which brine continues to slowly move onto and under his land, injuring and reinjuring his land and personal business daily.

Plaintiff cites *Peterson v. Texas Co.*, 163 Kan. 671, 186 P.2d 259 (1947), as authority. Peterson filed his first case against defendant in 1942, for damage to fresh water under plaintiff's land, damage to his basement and house foundation and his cattle, abandonment of his pasture, loss of chickens, and loss of egg production. Plaintiff was also compelled to hand carry water. Defendant operated an oil lease and allowed waste water to escape from a pond he maintained. The escaping waste water

caused plaintiff's injuries. In 1943 the parties settled the case.

Peterson brought a second action in 1945 against the same defendant. Peterson's second action was for damages incurred by defendant's operation of the oil lease which caused damage to the strata lying underneath his property. His well water became polluted causing him to rebuild it; he had to pump water out of his basement; additional damage was done to his farm animals; and additional loss of egg production occurred.

The court determined that each action was separate: (1) escaping surface pollution, and (2) pollution of the strata underneath Peterson's property. The second action was not barred by the statute of limitations or res judicata.

In *Gowing v. McCandless*, 219 Kan. 140, 547 P.2d 338 (1976), an upper landowner brought an action for damages to crops caused by the defendant's obstruction of a watercourse. The obstruction caused occasional flooding of the plaintiff's land. Schroeder, J. (now Chief Justice) stated the Kansas law on temporary damages:

"When this case went to trial the plaintiffs were not seeking to recover permanent damages to their land occasioned by the obstructions placed in the watercourse on the defendants' land. The posture of the case here presented is one in which the plaintiffs seek to recover *temporary damages* arising from the maintenance of obstructions in the watercourse on the defendants' land (alleged in the petition to be a continuing nuisance), and limit the recovery they seek to damages to their crops, sustained within two years prior to the filing of their petition, and punitive damages.

"Where the injury or wrong is classified by the courts not as original or permanent, but as temporary, transient, recurring, continuing or consequential in nature, it has been held that the limitation period starts to run only when the plaintiffs' land or crops are actually harmed by overflow, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent. [Citations omitted.] This rule is especially applicable if the situation involves other elements of uncertainty, such as the possibility or likelihood of the alteration or abatement of the causative condition, or uncertainty in regard to the future use or improvement of the land, so as to prevent a reasonably accurate estimate of future damages. [Citation omitted.]

"A number of our cases have permitted relief for damages caused by over-flowing waters if brought within two years of the overflowing. [Citations omitted.]

"In the instant case the evidence does not show the cause of the injury to be permanent. In many cases injuries have been classified as temporary or recurring in nature when caused by an abatable nuisance or condition, or by defects which

can be repaired or remedied at reasonable expense. Successive injuries of this nature have been held to give rise to separate and distinct causes of action. [Citation omitted.]

"It has frequently been said the principle upon which one is charged as a continuing wrongdoer is that he has a legal right, and is under a legal duty, to terminate the cause of the injury. [Citations omitted.]

"Under this rule the owner of land injured by overflows and poor drainage caused by an abatable condition or nuisance has the right to assume the condition or nuisance will be abated. Here the appellees presented evidence that the obstructions were not 'permanent.' That is to say, the obstructions could be removed from the drainage ditch. In a legal sense these obstructions were not 'permanent' because they were not approved by the state." 219 Kan. at 144-45.

Plaintiff's well has been polluted and undrinkable since 1974. Plaintiff alleges in his amended petition, seeking damages for a temporary injury, that not less than 150 years nor more than 400 years will pass before the well water will be once again fit for drinking. For all practical purposes plaintiff's damage is permanent and capable of being determined.

Correctly determining that plaintiff's action was for permanent damages as alleged in the petition, the court concluded that such claim was barred by the statute of limitations. K.S.A. 60-513($a$) states in part:

"($a$) The following actions shall be brought within two (2) years:

. . . .

"(4) An action for injury to the rights of another, not arising on contract, and not herein enumerated."

Plaintiff's final contention is that the court erred when plaintiff was denied, by the court, leave to file an amended petition after defendants' motion to dismiss was sustained. Plaintiff filed his petition against Marathon and Getty July 1, 1981, claiming permanent damages. Getty filed its answer September 8, 1981, and a motion to dismiss on September 15, 1981. Marathon filed a motion to dismiss September 8, 1981, and never was required to file an answer because plaintiff's action was dismissed by the court December 16, 1981, his claim for permanent injury being barred by the two-year statute of limitations. K.S.A. 60-513($a$). January 18, 1982, plaintiff moved to amend his petition to claim temporary damages, which amendment the trial court denied.

Plaintiff concedes under K.S.A. 60-215 he must obtain leave of the court or written consent from Getty because Getty has filed a written response (answer). Plaintiff claims he has a right to amend his petition against Marathon. Marathon has not filed a

responsive pleading. Marathon's motion to dismiss is not a responsive pleading. *Weaver v. Frazee*, 219 Kan. 42, 51, 547 P.2d 1005 (1976).

In *Hoover Equipment Co. v. Smith*, 198 Kan. 127, 422 P.2d 914 (1967), plaintiff filed to foreclose a mortgage. After issues were joined in the pleading, the action was dismissed by the trial court as to one defendant. Plaintiff moved to amend the pleadings. The trial court refused to allow the amendment. Justice Fromme wrote:

"A trial court is given wide latitude and discretion in permitting or refusing amendments of pleading in the interests of justice. In the absence of a clear abuse of discretion the order of the trial court should be approved." 198 Kan. at 133.

See *United Kansas Bank & Trust Co. v. Rixner*, 4 Kan. App. 2d 662, 610 P.2d 116, *aff'd* 228 Kan. 633, 619 P.2d 1156 (1980).

A discussion of this point is contained in 6 Wright & Miller, Federal Practice and Procedure: Civil § 1483 (1971) at pp. 413-16, as follows:

"Although it is clear that an amendment as of course may be served after a motion directed to the pleadings has been made, the question often arises whether the first sentence of Rule 15 (a) continues to be operative once the motion to dismiss is granted. Ideally, if it is at all possible that the party against whom the dismissal is directed can correct the defect in his pleading or state a claim for relief, the court should dismiss with leave to amend. This will afford the party against whom the dismissal is granted the option of amending his pleading or of having a judgment entered against him and taking an appeal. Dismissing with leave to amend is consistent with the mandate set forth in Rule 15 (a) that amendments should be freely granted. In addition, it puts the adverse party on notice that further proceedings in the action are possible, whereas an order that does not specifically include that right leaves the party who successfully moved to dismiss the original pleading in doubt whether his opponent can amend under Rule 15 (a). Of course, if repleading could not possibly correct the defects in the party's claim, then the court should dismiss the action without leave to replead.

"In practice a distinction appears to have been drawn by the courts. In general it has been held that a party may amend as of course within a reasonable time after an order dismissing the complaint has been entered, inasmuch as no responsive pleading has been served. However, if both an order dismissing the action and a final judgment have been entered, or a substantial period of time has elapsed since the dismissal, an amendment may be made only by leave of court. As stated by one court:

"If it should be held that plaintiff could amend without leave after a hearing and the granting of summary judgment against him, the effect would be to clothe a litigant with the power, at any time, to reopen a case and possibly to set aside a judgment rendered against him by the court. Rule 15 (a) is not to be construed so as to render Rule 12 meaningless and ineffective.

"The practice of requiring the court's leave to amend when there has been a

delay after the granting of a motion to dismiss appears sound, although it is questionable whether the formalistic distinction between the dismissal of a complaint and the entry of judgment used by some courts should be controlling. Indeed, the desirable practice may be to set a specific period after a motion to dismiss has been granted in which plaintiff may file an amended complaint. If he does not do so a final judgment should be entered. Once the motion has been granted, the successful party probably should be able to rely on the dismissal and have the opportunity to oppose any amendment that would reopen the litigation. Moreover, requiring leave of court to amend after the suit has been dismissed will not unduly burden the losing party inasmuch as Rule 15 (a) provides that leave is to be liberally granted.

"Finally, it should be noted that although requiring leave of court is more desirable then permitting an absolute right to amend, that practice may be criticized on the ground that it gives the trial court extensive power to allow amendments under Rule 15 (a) and might lead to circumvention of the time limits set forth in Rules 59 (e) and 60 (b) for reopening a judgment. As discussed more fully in a later section, this possibility has led several courts to hold that the proper procedure for a losing party to follow when attempting to amend after judgment is to seek relief under Rule 59 or Rule 60. This approach allows a district court to exercise discretion in deciding whether to relieve a party from a final judgment rendered against him and at the same time it promotes finality of judgments by insuring that the losing party only has a limited time within which to seek relief."

Allowing plaintiff to replead his claim against Marathon could not correct the defects in his claim. The trial court did not abuse its discretion in refusing to allow plaintiff to amend his petition against Getty or Marathon.

The judgment is affirmed as to Marathon and Getty in case No. 54,358.