Larry LAND, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Cong. Ref. No. 88–1X.

United States Court of Federal Claims.

April 15, 1996.

Samuel L. McClaren, Tucson, Arizona, for plaintiffs.

J. Charles Kruse, with whom were Assistant Attorney General Frank W. Hunger; J. Patrick Glynn, Director; Charles A. Quinlan,

III; and Matthew J. Regan, Washington, DC, for defendant. Maj. Jonathan Potter, Arlington, Virginia, of counsel.

## REPORT OF THE HEARING OFFICER

ROBINSON, Hearing Officer:

This case, a congressional reference, is before the court after trial on the merits and post-trial briefing. In short, plaintiffs claim that they suffered personal injuries and property damage as a result of activities conducted at the Rocky Mountain Arsenal ("Arsenal") near Denver, Colorado, more than 20 years ago. Specifically, plaintiffs claim that they and their cattle were poisoned by contaminants emanating from the Arsenal, a United States Army ("Army") installation where toxic chemical weapons have been manufactured, stored and dismantled since World War II. Plaintiffs contend that they and their cattle were exposed to the toxic contaminants through the groundwater and through airborne gases.

Plaintiffs are all individuals, most of them related by blood or marriage, who lived or worked on a cattle farm near the Arsenal at the time in question.

Before the trial, held in Denver in January 1996, the court had denied a motion by defendant, the United States, for summary judgment. *Land v. United States*, 29 Fed. Cl. 744 (1993). Because the facts that were brought forth at trial were different in some important respects from those pleaded prior to the court's denial of summary judgment, this Report shall generally disregard the facts as set forth in the prior Report of the Hearing Officer, 29 Fed.Cl. at 746–50, and shall make findings based solely on the evidence presented at trial and through joint stipulation.

### Findings of Fact

By the time Larry Land purchased his family's farm in the fall of 1971, he was already a skilled cattle farmer with experience in buying, auctioning and raising cattle for profit. Prior to taking over the family farm, Mr. Land had been living with his wife and children on a leased farm near Denver, called Box Elder Farm, where he had begun to build a herd two years earlier. When the move was completed in March 1972, Mr. Land's herd contained about 135 head of cattle.

The cattle which Mr. Land had moved from the Box Elder Farm were all native to Colorado. Those which had not been born and raised at Box Elder had been purchased by Mr. Land from other farms or auction houses shortly after they had been weaned. Mr. Land estimates that during those two years at Box Elder he lost only a single head of cattle to sickness.

Once he had moved his family and his herd to the family farm, Mr. Land began what he admits was a risky venture in cattle farming. In March 1972, Mr. Land imported 100 or more very young calves from Wisconsin. At trial there was some uncertainty as to just how young these calves were, but it appears, based on the testimony, that many of the calves were little more than a week old and not yet weaned. There was also some uncertainty as to the conditions under which the calves were transported from Wisconsin, but it appears that the calves were shipped in March in crowded, unheated trucks where they were easily exposed to each other's germs. The calves originated from several different farms. Mr. Land did not travel to Wisconsin to purchase the calves. He saw them for the first time when they arrived at his farm. Mr. Land remembers that the calves appeared tired after the long, cold trip, but he does not remember seeing any other outward signs of illness when he accepted delivery.

The parties agree that the type of cattle farming in which Mr. Land was engaging by importing calves was inherently risky notwithstanding the possible intervening condition of contaminated groundwater. Even under the best conditions, mortality and disease rates are appreciably higher among calves that are taken away from their mothers before they are weaned. Baby calves, unlike humans, are not born with their immune systems intact. To build up a baby calf's immunity to disease, the mother's first milk, called colostrum, provides the calf with valuable antibodies and nutrients. Baby calves that do not get the benefit of the colostrum

because they are taken too soon from their mothers are extremely vulnerable to disease, though there are manufactured substitutes for colostrum available to lessen the risk. At least some of the calves purchased by Mr. Land in March 1972 appear to have been taken away from their mothers while still nursing on colostrum. Moreover, because of the long trip from Wisconsin to Colorado, they were not given any substitute for the colostrum soon enough to ward off infection. An added aggravation was the trip itself. The close mingling of cattle from different farms on long truck or train rides is known to cause "shipping fever," a kind of septicemia, and to otherwise lower cattle's natural resistance to disease. A further source of stress on the calves was the cold weather to which the calves were exposed during the long trip in the back of the unheated truck. Studies of mortality in young transported calves have shown that the most frequent causes of death among such calves are pneumonia and scours (diarrhea). Staples et al., *Losses in young calves after transportation.* 130 Br.Vet.J. 378 (1974).

There is some disagreement between Mr. Land and his veterinarian, Dr. Robert Scott, as to how soon the calves' condition worsened after their arrival on the Land farm, but on that point Dr. Scott's memory was more specific and reliable. Dr. Scott testified that within only a few days of arrival the calves began to die. Mr. Land had observed that the calves began to suffer from blisters, poor coordination (ataxia), vomiting and scours and that they were not taking food or water normally. After some of the calves died, Dr. Scott necropsied them and observed, among other ailments, meningitis, pneumonia, hemorrhaging, tracheitis, bronchitis, and petechiae on the heart valves indicating septicemia. Within a few months, 144 (out of 400)

calves in Mr. Land's herd either had died or had to be destroyed.[1]

When they first moved onto the farm and for about a month thereafter, Mr. Land and his family were drinking and using water from an 800–foot well which had been drilled several years earlier. The same well was being used during the first month for watering the cattle, including the newly arrived calves. Mr. Land encountered problems with the 800–foot well, however, and on April 11, 1972, he had a new 266–foot well drilled to service both his family and the livestock. The 800–foot well apparently continued to service the home of Mr. Land's mother and stepfather, which was a separate building on the same 80–acre property.

Mr. Land has several reasons for believing that some contamination in the groundwater on his property caused the death of his cattle. Specifically, Mr. Land alleges that when the second well was drilled the water was initially a reddish color. Mr. Land also alleges that the fish he kept in his cattle-watering tanks to control algae died when exposed to the water pumped from the 266–foot well. Further, Mr. Land alleges that several of his cattle were able to survive once they were moved off the Land farm and onto a neighbor's borrowed pastures and corrals later in the spring of 1972.

As for personal injuries, Mr. Land alleges that after they began drinking and using water from the 266–foot well, he and his family began suffering strange symptoms which he attributes to drinking and bathing in the same well water. These symptoms included lethargy, headaches, airway irritation, eye irritation, bronchial irritation, nausea, diarrhea, and mental and emotional changes.

Dr. Scott was convinced that the calves' illness was related to groundwater contami-

---

1. Mr. Land claimed on the witness stand that several hundred adult cattle also died during the spring of 1972, putatively due to the same poisoning that inflicted the calves. The documentary evidence, however, confirms only the figure of 144 calf losses. Plaintiffs' first amended complaint states that half of 520 calves and yearlings were lost, but plaintiffs' evidence likewise fails to substantiate that figure. For the purpose of this Report, the court shall disregard plaintiffs' testimony concerning lost cattle other than the 144 calves because those losses are unsubstantiated by contemporaneous evidence. Admittedly, of course, even the figure of 144 is somewhat tenuous because the only contemporaneous source for that figure is a statement attributed to Mr. Land in June 1972 when he brought three calves in for clinical study at Colorado State University. Nonetheless, the court shall accept the figure of 144 as correct.

nation, and he suspected that the specific contaminant was fluorine because some of the calves' symptoms were consistent with fluorine toxicosis. Moreover, a test run on Mr. Land's well water by the state Department of Public Health on June 20, 1972, had revealed that Mr. Land's water contained 1.8 parts per million ("ppm") of fluoride, which was slightly higher than the maximum allowable federal standard for drinking water of 1.7 ppm for fluoride. In June 1972 Dr. Scott and Mr. Land sent three sick calves to be tested at the Colorado State University College of Veterinary Medicine and Biomedical Sciences in Ft. Collins, Colorado. Based on studies of three calves, all of which died during examination, the veterinary clinicians determined that only non-toxic levels of fluorine were present in their tissues. They further concluded that each of the calves had died from bronchopneumonia. The doctors, however, did not test the calves for toxins other than fluorine.

The local health department conducted a test of water from Mr. Land's 266-foot well in 1975. The test revealed that the water contained small amounts of diisopropyl methylphosphonate ("DIMP"), specifically 13.1 parts per billion ("ppb"). DIMP is a by-product of the production of GB nerve gas, which was manufactured at the Arsenal until 1957. The parties agree that DIMP probably entered the aquifer via leakage at one of the liquid waste disposal basins located at the Arsenal, which was up-gradient from the family farm. Because a test to detect DIMP did not exist before 1974, and because one of the disposal basins at the Arsenal was known by the Army to be leaking at least as early as 1969, it is reasonable to infer that some

quantity of DIMP was present in the groundwater under plaintiffs' property during the spring 1972 period which is critical to this litigation. On that basis, plaintiffs assert that their physical ailments and the deaths of their cattle were caused by the presence of DIMP in the water drawn from the 266-foot well.

The toxicity of DIMP was suspected, but unknown, in 1975. Since then, however, based on a handful of studies conducted with mammals, the United States Environmental Protection Agency ("EPA") has established a safe drinking-water standard of 600 ppb for DIMP and a standard of 30 ppm (i.e., 30,000 ppb) for non-consumption contact, such as bathing and swimming. U.S. EPA, *Dissopropyl Methylphosphonate (DIMP) Health Advisory* (January 1989). Based on these standards, the level of DIMP detected in plaintiffs' well water must be considered harmless. The water contained only 13.1 ppb of DIMP in 1975—approximately 2.2 percent of the EPA standard for safe drinking water.[2]

As the court discusses in greater detail below, scientific studies of DIMP's effect on animals have shown that in very large doses DIMP can have many deleterious effects, including death. In small doses, however, DIMP is harmless. DIMP does not build up in the body as it is consumed; instead, the chemical is barely detectable in the body more than 24 hours after consumption.

## DISCUSSION

The jurisdictional basis for the court's hearing of this case was discussed in the previous Report of the Hearing Officer,

---

2. The court notes here that James Land was the only other plaintiff besides Larry Land who testified in these proceedings. James and Larry are brothers. During the relevant period, James Land's home was on the same 80-acre family property as Larry Land's home, but James Land's home was on the opposite end of the tract, and he and his family used water from a different well than the one his brother used. Of course, James Land's well drew water from the same aquifer as Larry Land's well, but it was farther downstream. No measurable level of DIMP or any other toxic substance has ever been detected in the well used by James Land and his family during the relevant period.

James Land testified about his memory of events in the late 1960s and early 1970s, particularly concerning the odors that were allegedly emanating from the Arsenal throughout the surrounding regions, including the area of the Land family farm. James Land also testified about crop and orchard damage, as well as physical illnesses of himself and his family, all of which he attributed to contaminated groundwater. However, because there is no evidence suggesting that James Land's well was contaminated during the relevant period, the court gives his testimony little weight.

*Land,* 29 Fed.Cl. at 750–751. In brief, the court determined that the congressional reference permitted the instant plaintiffs to pursue an equitable claim for damages based on allegations that defendant's negligence or wrongful conduct in operating the Arsenal caused personal injuries and property damage.

In denying defendant's motion for summary judgment, the court was particularly concerned by defendant's admissions that liquid chemical wastes dumped into basins on the site of the Arsenal were known to be leaking into the aquifer serving the surrounding farmland several years before the events at issue in this case. The court was further concerned because evidence suggested that the Army had failed to take adequate measures to prevent or stop the spread of groundwater pollution emanating from the Arsenal once the problem was known. The 1975 detection of DIMP in plaintiffs' well water indicated unequivocally that at least one toxic chemical, known to be a by-product of the manufacture of GB nerve gas, had made its way from the disposal basins at the Arsenal to the groundwater underlying plaintiffs' property. The matter was thus set for trial to permit plaintiffs to establish a causal link between their alleged injuries and property damage and defendant's apparent negligent or wrongful acts or omissions in disposing of chemical wastes at the Arsenal.

■ At the outset, the court notes that even if the evidence presented at trial established that defendant had acted negligently or wrongfully in operating the Arsenal, such a finding would not have relieved plaintiffs of their burden to show that their injuries and property damages were caused by groundwater contamination. As to how the court should allocate the burdens of proof between the parties in a congressional reference case raising equitable tort claims, it is reasonable to follow the practice of federal district courts in cases arising under the Federal Tort Claims Act ("FTCA"). Under the FTCA, a district court determines tort liability under the rule of *lex locus delicti, i.e.,* "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The *locus* of the present case is

Colorado. In Colorado, a plaintiff alleging injuries based on negligence has the burden of proving causation in his prima facie case. *Heller–Mark & Co. v. Kassler & Co.,* 37 Colo.App. 267, 269, 544 P.2d 995, 997 (1976) (citations omitted). To prove causation, a plaintiff must demonstrate, through a preponderance of the evidence, that it is reasonably probable that the defendant's act or omission was the proximate cause of the plaintiff's alleged injury. *In re Swine Flu Immunization Products Liability Litigation,* 495 F.Supp. 1188, 1206 (D.Colo.1980) (citations omitted). In other words, based on the FTCA practice, the instant plaintiffs were required at trial to show that their physical illnesses and the loss of their cattle were, more likely than not, caused by contaminants in the groundwater which, more likely than not, emanated from the Arsenal.

■ The court shall first take up plaintiffs' property damage allegations. The only evidence presented at trial regarding such damages concerned the loss of Mr. Land's 144 calves in 1972. The preponderance of evidence weighs heavily against plaintiffs' contention that they died from groundwater poisoning. Taking into account the conditions under which the calves were purchased and transported to Mr. Land's farm and the expected high rate of death and disease among young calves under such conditions, it is more likely than not that Mr. Land's calves died from causes other than poisoning. Indeed, the symptoms described by Mr. Land and Dr. Scott are all consistent with the diseases which would be expected to inflict calves under such conditions—pneumonia, scours and septicemia. The necropsies conducted on three of Mr. Land's calves at Colorado State University in June 1972 support this finding.

It is true that DIMP was probably present in Mr. Land's well water in 1972 and that no scientist could have detected it at that time because a test for DIMP had not yet been developed. However, the level of DIMP detected in the well in 1975 was so minuscule that it is highly unlikely that, just three years earlier, Mr. Land's well water contained harmful levels of DIMP, for the reasons discussed below.

There has been at least one scientific study of the toxicity of DIMP in calves (Palmer et al., *Toxicologic evaluation and fate of diisopropyl methylphosphonate (DIMP) and dicyclopentadiene (DCPD) in cattle.* Veterinary Toxicology and Entymology Research Laboratory, U.S. Department of Agriculture, College Station, TX. AD–A093 673/2.) ("Palmer study"). The EPA relied upon the Palmer study in preparing its 1989 Health Advisory for DIMP. In the study calves aged 8–10 weeks were fed DIMP at varying doses, *i.e.,* 62.5, 125, 250, 500, and 1,000 milligrams per kilogram of body weight ("mg/kg"). The calves were observed for 14 days after dosing. The EPA summarized the Palmer study in part as follows:

> Calves receiving the 1,000 mg/kg dose displayed signs of intoxication which included tympanitis and ataxia followed by depression and prostration. All calves at this dose level died within two hours. Gross pathological examination revealed acute gastroenteritis with ecchyomotic hemorrhage of the mucosal surface of the gastrointestinal (GI) tract. Evidence of pulmonary emphysema and cerebral edema were also indicated. Histological examination of two of these calves revealed severe submucosal and mucosal edema of the esophagus in both calves while cerebral edema was suggested by prominent perivascular, periglial, and perineuronal spaces in the cerebral cortex of one calf.

> Among the animals receiving the lower doses of DIMP [62.5, 125, 250 or 500 mg/kg], no significant changes were observed in body weight, clinical chemistry values, and most of the hematological parameters.

Based on the Palmer study, defendant's veterinary expert, Dr. Gavin Lee Meerdink, testified that in his expert opinion the death of Mr. Land's calves could not be attributed to DIMP poisoning. Applying the Palmer study to the present case, Dr. Meerdink noted that harmful effects in calves were observed at the 1,000 mg/kg level of consumption, but that no harmful effects were observed at the 500 mg/kg level. On that basis, Dr. Meerdink concluded that calves would need to consume at least an amount greater than 500 mg/kg in order to suffer the harmful clinical effects which the Palmer study observed in calves receiving a 1,000 mg/kg dose. It is not disputed that several of the symptoms observed in such calves, including ataxia, hemorrhaging, and gastrointestinal disorders, were also observed by Dr. Scott in Mr. Land's calves. However, such symptoms have many possible causes, such as viral or bacterial infections, and are not unique to DIMP poisoning. It is highly unlikely that Mr. Land's calves received doses of DIMP even close to the 500 mg/kg level. Noting that the only level of DIMP ever detected in Mr. Land's well water was 13.1 ppb in 1975, Dr. Meerdink estimated that, based on a hypothetical level of DIMP in Mr. Land's well water of 14 ppb, and based on an average body weight and average level of water consumption for young calves, Mr. Land's calves were getting a daily dose 0.001 mg/kg per day. In other words, it is likely that Mr. Land's calves were getting a daily dose of DIMP that was only 1/500,000 of the amount above which harmful effects were observed in the Palmer study. Plaintiffs, moreover, have presented no evidence suggesting that the level of DIMP in their water in 1972 was 500,000 times greater than 13.1 ppb in 1972.[3]

On this point, plaintiffs rely heavily on *Rusch v. Phillips Petroleum Co.,* 163 Kan. 11, 180 P.2d 270 (Kan.1947). *Rusch* concerned a lawsuit by a farmer in Kansas, a state neighboring Colorado, who sued a number of oil companies alleging that they had negligently polluted the groundwater the farmer used for watering his livestock in 1942 and 1943. The defendants demurred on the grounds that plaintiff had failed to pres-

---

**3.** At trial plaintiffs suggested that the Army's demilitarization program, in which chemical ordnance was neutralized and dismantled, somehow contributed to elevated levels of contaminants in the groundwater. The weight of the evidence, however, suggests that the demilitarization program likely had no effect on plaintiffs'

well water in 1972. DIMP is a byproduct of the *production* of GB nerve gas, and neither party presented evidence indicating that breaking down GB nerve agent post-production would produce additional DIMP. More importantly, though, the Army did not begin to dismantle GB weapons at the Arsenal until 1974.

ent chemical analyses of his well water from 1942, thereby failing to make a prima facie case that his water was contaminated in 1942. The court overruled the demurrer, however, because there was competent non-scientific evidence suggesting that the water was tainted in 1942 and that it had impaired the livestock. As a result of the court's ruling, the jury was permitted to decide, without the benefit of scientific tests, whether the water had in fact been polluted in 1942 and whether the pollution had been caused by defendants. 163 Kan. at 16–17, 180 P.2d at 275.

Notwithstanding the fact that *Rusch* is not a case construing Colorado tort law, plaintiffs contend that *Rusch* supports the proposition that, in the present case, they should not be required to show specifically what contaminant in the groundwater injured their cattle as long as they can establish that the groundwater was the cause of their cattle's injuries and that defendant's negligent actions resulted in the pollution of the aquifer. The court believes, however, that plaintiffs are reading *Rusch* incorrectly. The *Rusch* court merely concluded that there was sufficient competent evidence suggesting contamination in 1942 to put before the jury the question of whether the groundwater was in fact contaminated during that year. The court did not say that the evidence was such that the jury had no choice but to hold defendants liable.[4]

The scientific basis for Dr. Meerdink's opinion as to the cause of the calves' death is unrebutted. Plaintiffs rely primarily on the deeply felt conviction of their own veterinary expert, Dr. Scott, that the cause of the calves' illness must have been some contaminant in the water. Dr. Scott's opinion, in short, is visceral, not scientific. He did have the advantage of observing and necropsying Mr. Land's calves in the course of his practice. His recollections of these observations, however, are of little value because, in formulating his opinion, Dr. Scott disregarded or discounted the scientific evidence of DIMP's toxicity that has been developed in the years since those deaths occurred. DIMP, it must be emphasized, is the only Arsenal-related substance that has ever been detected in Mr. Land's well water. The studies relied upon by the EPA in establishing its Health Advisory, including the Palmer study, simply do not implicate DIMP as a likely cause of the symptoms which Dr. Scott observed in 1972 because it is doubtful that the calves were consuming DIMP at harmful levels.

■ With regard to plaintiffs' allegations of physical injuries supposedly caused by exposure to contaminants in the groundwater and the air, the court notes that most of Mr. Land's testimony concerning these alleged injuries was uncorroborated by contemporaneous medical records. In part the lack of corroboration appears to be due to Mr. Land's own design. He stated during his cross-examination that for many years he purposely had not disclosed to doctors, insurers or employers the fact that he believed he had been poisoned by emissions from the Arsenal, and he had instructed his wife and children to likewise remain silent about the poisoning. He testified that he instructed his family not to disclose their supposed injuries because he feared that by doing so they would be perceived as handicapped and would be unable to obtain decent employment or health or life insurance.[5]

Given the lack of corroboration for much of Mr. Land's testimony about his physical injuries, his ability to recover damages for his alleged personal injuries depends heavily on his credibility. After hearing his testimony and reviewing the parties' exhibits, the court concludes that Mr. Land was not credible.

---

4. In reality, *Rusch* supports the court's actions in the present case. As in *Rusch*, the court in the present case denied pretrial motions by defendant which would have precluded plaintiffs from presenting evidence supporting their theories of recovery. Of course, by allowing plaintiffs to present their evidence, the court did not guarantee that plaintiffs' evidence would be more persuasive than defendant's.

5. Mr. Land's fear of being perceived by others as handicapped was apparently the reason he had lied about his health on a job application in July 1984. When applying for a position with the sheriff's department in Washington County, Minnesota, Mr. Land answered "no" when asked if he had ever suffered any of 44 different symptoms. Many of the 44 symptoms, such as headaches and dizziness, are ailments which he allegedly suffered after he moved onto the family farm in 1972.

This conclusion is based on several factors which became known to the court for the first time at trial. To be specific, throughout the initial phase of this litigation and until his cross-examination in January 1996, Mr. Land maintained that his cattle did not become sick or die until after they began drinking water from the new 266–foot well he had drilled in the spring of 1972—the same well in which DIMP was detected in 1975. On the stand, however, Mr. Land admitted that his cattle arrived on the farm in March 1972 and that the 266–foot well was not drilled until April 11 of that year. But Mr. Land admitted on cross-examination, as did Dr. Scott, that the cattle began showing signs of illness and even dying within only a couple of days of their arrival at the farm, at which time the cattle must have still been drinking water from the 800–foot well. Even assuming, hypothetically, that the groundwater from the 800–foot well was just as contaminated as water from the 266–foot well, Mr. Land's confusion about the timing of crucial events during that critical period casts substantial doubt on his theory about what caused his cattle's death.

Mr. Land admitted that in August 1984 he suffered a severe head injury as the result of a bicycling accident, that his memory has been impaired as a result of that injury, and that his doctors have diagnosed him as having some sort of paranoiac or delusional mental disorder. The court is genuinely sympathetic with Mr. Land's condition. Regretfully, however, the fact that Mr. Land has a mental illness militates against giving much credit to his testimony.[6] Even if Mr. Land's memory were perfect, however, the court notes that plaintiffs introduced no reli-

able medical opinions supporting in any respect their allegations of personal injuries occurring in 1972 in connection with the water or air on their farm.[7]

Applying the preponderance of evidence standard to plaintiff's allegations of physical injuries, the court concludes that, if they existed, it is unlikely that they were caused by any known chemical agent in the well water which plaintiffs were drinking and using in 1972. Plaintiffs presented no evidence, moreover, that there were airborne toxic emissions emanating from the Arsenal in the spring of 1972. Having reached a similar conclusion with respect to plaintiffs' property damage allegations, the court concludes that plaintiffs have failed to carry their burden to show any causal link between their personal injury claims and the contamination of their groundwater.

Because the court has found that plaintiffs failed to prove causation for any of their alleged damages by a preponderance of the evidence, it is unnecessary for the court to determine conclusively whether the Army acted negligently or wrongfully in operating the Arsenal in such a manner that plaintiff's groundwater was contaminated.

### CONCLUSION

Because plaintiffs have failed to prove that their personal injuries and the loss of their cattle were caused by contaminants known to have emanated from the Arsenal, the court must conclude that an award of damages in the present case would be a mere gratuity. Therefore, based on the evidence, the court

---

**6.** Defendant introduced some of Mr. Land's more recent (1991) medical records, and the court admitted those records without objection. Aside from confirming Mr. Land's oral admissions about his mental conditions, those records reveal that he has unsuccessfully sought doctors' opinions to support claims that he was exposed to toxic chemicals at work in Minnesota in 1985 and 1990. Unpersuaded that Mr. Land had in fact suffered such toxic exposures, at least two doctors determined that his ailments were psychosomatic.

**7.** Plaintiffs' medical expert, Dr. Daniel T. Teitelbaum, was informative concerning the potential

dangers of DIMP and the history of public concern over hazardous wastes at the Arsenal. However, his "preliminary" medical opinion that plaintiffs' injuries were probably caused by DIMP poisoning is of little value because Dr. Teitelbaum did not conduct physical examinations of the plaintiffs. Such examinations, Dr. Teitelbaum admitted, would be necessary in order for him to form a conclusive opinion about the cause of plaintiffs' injuries. On that basis, the court can accord no weight to Dr. Teitelbaum's medical opinion about the cause of plaintiffs' injuries.