**Larry LAND, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 1–88.**

United States Court of Federal Claims.

Jan. 27, 1997.

Samuel L. McClaren, Tucson, AZ, for plaintiffs.

J. Charles Kruse, with whom were Assistant Attorney General Frank W. Hunger, J. Patrick Glynn, Director, Charles A. Quinlan, III, and Matthew J. Regan, Washington, DC, for defendant. Maj. Jonathon Potter and Capt. Thomas Cook, Department of the Army, of counsel.

Before the Review Panel: THOMAS J. LYDON, Senior Judge, Presiding Officer, KENNETH R. HARKINS, Senior Judge, and ROGER B. ANDEWELT, Judge.

## REPORT OF REVIEW PANEL

PER CURIAM.

In this congressional reference case,[1] the review panel is presented with plaintiffs' challenge, on legal and factual grounds, to

---

1. The House of Representatives referred this case to the court on September 22, 1988. H.Res. 61 states:

> RESOLVED, That H.R. 816 entitled "A bill for the relief of Larry Land, Marie Land, and others," together with all the accompanying papers, is hereby referred to the Chief Commissioner of the Court of Claims pursuant to section 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.

H.R. 816 states:

A BILL

For the relief of Larry Land, Marie Land, Brian Land, Keith Land, Patricia Vandenberg, Lorri Vandenberg, James W. Land, Lois Land, Tamra Lee Land, Sandra Gay Land, Vincent James Land, Viola Hollenbaugh, William L. Phinney, Senior, Emily V. Phinney, Lora Phinney, and William L. Phinney, Junior.

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $____ to [plaintiffs]. This sum shall be in full and complete satisfaction of all their claims against the United States based upon health problems and other related injuries resulting from the operations and activities at the Rocky Mountain Arsenal, Denver Colorado, conducted under the auspices and control of the United States Army.

the Report of the Hearing Officer which concluded that plaintiffs had not demonstrated any legal or equitable claim against the United States and that an award of damages to plaintiffs, Larry Land, *et al.*, would be a gratuity.[2] After reviewing the record, the parties' briefs, and hearing oral argument, the review panel affirms the report of the hearing officer.

Briefly, plaintiffs claim they suffered personal injuries and property damage as a result of activities conducted at the Rocky Mountain Arsenal (Arsenal) near Denver, Colorado, more than twenty years ago. Specifically, plaintiffs allege that they and their cattle were poisoned by contaminants emanating from the Arsenal, a United States Army (Army) installation where toxic chemical weapons have been manufactured, stored and dismantled since World War II. Plaintiffs contend that they and their cattle were exposed to the toxic contaminants through the groundwater and through airborne gases. Plaintiffs are all individuals, most of them related by blood or marriage, who lived or worked on a cattle farm near the Arsenal at the time in question. For a more detailed statement of facts see the Report of the Hearing Officer at *Land v. United States,* 35 Fed.Cl. 345 (1996).[3]

There is no dispute that the Army's activities on the Arsenal resulted in one of the worst hazardous waste pollution sites in the country. Established in 1942, the Arsenal has been used by the Army to manufacture toxic chemical and incendiary munitions including mustard gas and nerve gas. After World War II portions of the Arsenal were leased to private chemical companies which produced agricultural pesticides. The twenty-seven square miles that the Arsenal encompasses has 120 contamination sites which contain huge quantities of liquid and solid wastes, some of which were unique because of the mixture of private herbicide and pesticide manufacturing activities with Army munitions manufacturing.

Before the trial, the hearing officer denied defendant's motion for summary judgment. Although the hearing officer considered defendant's arguments in support of summary judgment well-grounded, he denied defendant's motion and advised plaintiffs that they survived defendant's motion "by a very narrow margin." *Id.* at 757–58. The hearing officer cautioned plaintiffs "that they must still prove at trial that [defendant's] activity is wrongful and that it caused injury." *Id.* at 756. At trial, defendant contested causation in fact, and whether defendant's acts violated the standards of reasonableness by which negligence or wrongful conduct is determined. After the trial, the hearing officer issued his report in which he concluded that plaintiffs failed to prove by a preponderance of the evidence that their alleged personal injuries and property losses were caused "by any known chemical agent in the well water which plaintiffs were drinking and using in 1972," and "[p]laintiffs presented no evidence ... that there were airborne toxic emissions emanating from the Arsenal in the spring of 1972." *Land,* 35 Fed.Cl. at 352. Because plaintiffs had failed to prove causation for any of their alleged damages, the hearing officer did not reach the question of whether the Army acted negligently or wrongfully in operating the Arsenal. *Id.* Plaintiffs have taken exception to the hearing officer's determination.

**1. Standard of Review**

■ The relationship of the hearing officer to the review panel is comparable to that between a district court judge and a court of appeals. The standard of review applicable to legal questions employed by courts of appeal when reviewing *district court decisions* is one of *de novo* review. The *de novo* standard of review will govern the consideration of legal issues by the review panel in

**2.** Under 28 U.S.C. § 2509 (the congressional reference statute), the hearing officer is to determine the facts of the claim in question and advise Congress whether "the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c).

The review panel "by majority vote, shall adopt or modify the findings or the conclusions of the hearing officer." 28 U.S.C. § 2509(d).

**3.** The Hearing Officer's Report is attached to this report for the benefit of the reader.

this case. Accordingly, no deference need be given the legal conclusions reached by the hearing officer. *Merchants Nat'l Bank of Mobile v. United States,* 7 Cl.Ct. 1, 8–9 (1984).

■ The Rules of the Court of Federal Claims provide that "[t]he hearing officer's findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the hearing officer to judge the credibility of witnesses." RCFC Appendix D ¶ 8. The burden is on plaintiffs to prove that the hearing officer's findings of fact are clearly erroneous. It is generally accepted that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Milmark Services, Inc. v. United States,* 731 F.2d 855, 857 (Fed.Cir.1984) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948)). Thus, it is not enough that the review panel would have reached different factual conclusions had the decision been its to make initially. Further, the review panel gives great weight to the findings made by the hearing officer and the inferences he drew from the evidence of record. *Merchants,* 7 Cl.Ct. at 7.

The hearing officer stated plaintiffs' burden of proof as follows:

> In Colorado, a plaintiff alleging injuries based on negligence has the burden of proving causation in his prima facie case. *Heller–Mark & Co. v. Kassler & Co.,* 37 Colo.App. 267, 269, 544 P.2d 995, 997 (1976) (citations omitted). To prove causation, a plaintiff must demonstrate, through a preponderance of the evidence, that it is reasonably probable that the defendant's act or omission was the proximate cause of the plaintiff's alleged injury. *In re Swine Flu Immunization Products Liability Litigation,* 495 F.Supp. 1188, 1206 (D.Colo. 1980) (citations omitted). In other words, based on the FTCA [Federal Tort Claims Act] practice, the instant plaintiffs were

required at trial to show that their physical illnesses and the loss of their cattle were, more likely than not, caused by contaminants in the groundwater which, more likely than not, emanated from the Arsenal. *Land,* 35 Fed.Cl. at 349. Plaintiffs conceded at oral argument that the hearing officer applied the correct standard of proof. After considering all the evidence adduced at trial the hearing officer concluded that plaintiffs' had failed to meet this burden with regards to both their allegations of physical injuries and property damage. *Id.* at 352.

Plaintiffs list the following exceptions to the hearing officer's report: (1) that the hearing officer committed legal error by improperly applying Colorado law in requiring proof of a specific compound in order to prove causation; (2) that the hearing officer committed legal error by ignoring circumstantial proof of causation in violation of Colorado law; (3) the hearing officer committed legal error by failing to apply the Colorado standard for DIMP;[4] (4) the hearing officer's findings that the proximate cause of the illness and death of cattle was from causes other than the contamination of well water; and (5) that the hearing officer failed to recognize plaintiffs' circumstantial evidence that defendant's contaminants were responsible for or contributed to illnesses of plaintiffs and to the death of cattle. It is apparent from plaintiffs' briefs and from oral argument that the substance of plaintiffs' argument is their belief that they submitted sufficient competent circumstantial evidence in accordance with Colorado law to support their claims.

## 2. Proof of Causation

### A. Standard for Proof of Causation in Groundwater Contamination Cases

■ Plaintiffs argue that Colorado law provides for two alternative methods to prove causation in a toxic tort case. The first method, plaintiffs aver, involves showing that a single toxic compound was present in sufficient concentration to cause injury. The

---

4. DIMP (diisopropyl methylphosphonate) is a by-product of the production of GB nerve gas which

was manufactured at the Arsenal until 1972.

second method, which plaintiffs contend they followed, involves circumstantial proof of the probability of the presence of one or more contaminants, which may or may not be identified, which are shown to have probably caused or contributed to the cause of injury. Plaintiffs allege that the hearing officer made no findings on the adequacy of such proof. Instead, plaintiffs argue, the hearing officer decided this case on a single compound basis creating a burden of proof not required by Colorado law.

In their opening brief, plaintiffs' cite to the district court's opinion in *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545 (D.Colo. 1990), *aff'd*, 972 F.2d 304 (10th Cir.1992) to establish Colorado law regarding proof of causation in a groundwater contamination case. Plaintiffs cite *Renaud* for the proposition that there are two methods of proving causation: (1) prove the presence of a single chemical in sufficient concentration to cause harm, and (2) present proof of circumstantial evidence of exposure. Plaintiffs, as noted above, contend that they presented a case based on circumstantial evidence. Plaintiffs contend that the record consists of the following circumstantial evidence: (1) Hydrological evidence showing (a) movement of contaminated groundwater in the shallow aquifer, (b) the timing of such movement to the Home Place, and (c) the existence and importance of a high water table and high withdrawal rates from plaintiffs' wells; (2) The identity of contaminants introduced into the groundwater by the defendant; (3) Movement of contaminants into plaintiffs' wells; and (4) Sickness of people and animals and other evidence of contamination of the well water.

Assuming, *arguendo*, that plaintiffs at trial adduced evidence on each of the points listed above, the hearing officer had to determine the appropriate weight to be given to such evidence. Plaintiffs presented five witnesses in support of their claims. The hearing officer found the testimony of plaintiffs' witnesses generally unpersuasive, incompetent, and in certain cases, not credible. The hearing officer rejected the testimony of plaintiff Larry Land, because he was "not credible." *Land*, 35 Fed.Cl. at 351. The testimony of plaintiff James Land was also discounted because "[n]o measurable level of DIMP or any other toxic substance has ever been detected in the well used by James Land and his family during the relevant period." *Id.* at 348 n. 2. Dr. Scott's testimony, offered to support Larry Land's cattle claims, was given little weight because he, "just simply with his own statements under oath here before this court disqualified himself to testify as to causation." Tr. 426:14–16. With regard to the testimony that Dr. Scott was competent to give, the court found that "Dr. Scott's opinion, in short, is visceral, not scientific." *Land*, 35 Fed.Cl. at 351. The hearing officer did not discuss the testimony of Dr. Waddell, plaintiffs' groundwater hydrologist. A review of the record, however, reveals that Dr. Waddell offered no testimony regarding the issue of whether plaintiffs' water was causally related to plaintiffs' alleged injuries and property damage. Finally, the hearing officer accorded no weight to the testimony of Dr. Daniel T. Teitelbaum, plaintiffs' medical expert, because Dr. Teitelbaum did not conduct physical examinations of the plaintiffs. *Id.* At 352 n. 7. In reviewing the factual setting in this case, the review panel concludes that the hearing officer's findings that plaintiffs had failed to prove causation for any of their alleged damages are supported by the record and are not clearly erroneous.

The district court in *Renaud* noted that the two primary forms of circumstantial evidence in a toxic tort case are etiological evidence and epidemiological evidence.[5] *Renaud*, 749 F.Supp. at 1553. Plaintiffs made no attempt to submit either type. Instead, plaintiffs argue that "[c]ircumstantial proof requires evidence that the tortfeasor re-

---

**5.** Etiology is the cataloging of all of the known causes of a given disease. Plaintiffs could have presented etiological evidence by showing that their injuries and the illness of the cattle were the type caused by exposure to DIMP or some other known chemical that was produced at the Arsenal. Epidemiology is the study of the pattern of incidence and distribution of disease in a defined population group. Epidemiological evidence in this case could have been data which showed there was a higher incidence of chemical poisoning related illnesses among residents and livestock in the area surrounding the Arsenal as compared to similar communities.

leased injurious compounds either intentionally or through inadvertence." Further, plaintiffs argue that they only cited *Renaud,* to "explain the distinction between circumstantial cases and toxic tort cases." *Renaud,* however, does not distinguish between circumstantial and toxic tort cases, it provides guidance as to plaintiffs' burden of proof with respect to causation. The district court held that in order to prove causation:

> [P]laintiffs must prove that defendants caused plaintiffs' exposure to toxic contamination and that the exposure caused, or contributed to plaintiffs' injuries. *See Brafford v. Susquehanna Corp.,* 586 F.Supp. 14, 17–18 (D.Colo.1984). Therefore, in order to establish a causal connection between the contamination at Waterton [defendant's facility] and plaintiffs' injuries, it was necessary to show facts and circumstances which indicated with a reasonable probability that the injuries resulted from, or were caused by, the Waterton contamination. *See In re Swine Flu,* 495 F.Supp. at 1206.

> \*    \*    \*    \*    \*    \*

> However, proof that [Defendant] committed reprehensible acts coupled with evidence of injury is not enough to prevail on a tort claim. *Plaintiffs must prove that the reprehensible acts caused, or increased the likelihood of, the alleged injuries.*

*Renaud,* 749 F.Supp. at 1551 (emphasis added). Thus, whether plaintiffs choose to prove their case by direct evidence or by circumstantial evidence, plaintiffs still have the burden to prove causation. Without any direct evidence of causation plaintiffs relied on circumstantial evidence, which the hearing officer found unpersuasive. Plaintiffs presented evidence relating to: the type of chemicals manufactured at the Arsenal, the fact that the chemicals seeped into the underground aquifer, that plaintiffs used well water supplied by the shallow aquifers under the Arsenal, and that plaintiffs smelled unpleasant odors and suffered from some symptoms and their cattle became sick after arriving on the farm. Plaintiffs, however, did not present any circumstantial evidence showing that their alleged illnesses were consistent with the symptoms of poisoning by either DIMP,

mustard gas, nerve gas, pesticides, herbicides, elemental mercury, or any other chemical found at the Arsenal.

Plaintiffs cite *Canon City & C.C.R. Co. v. Oxtoby,* 45 Colo. 214, 100 P. 1127 (1908) for the proposition that hydrological evidence alone is sufficient to prove causation. Plaintiffs misread *Canon.* In *Canon,* the Plaintiff sued to recover damages caused by water which escaped from an artificial excavation on the Defendant's property. The Colorado Supreme Court did hold that it was foreseeable that water from the Defendant's property could seep or percolate and thereby cause injury to the Plaintiff's land. The court, however, did not conclude that foreseeability equaled causation, rather, it sustained the trial court's findings, based on "sufficient legal and competent evidence," that the water actually did reach and cause injury to the Plaintiff's land. *Canon,* 45 Colo. at 217, 100 P. at 1128. Plaintiffs' hurdle in the case at bar was to present competent evidence that plaintiffs' were in fact injured by the actions of the Army. Tests conducted on plaintiffs' water by the Colorado Department of Health in 1972, 1973, and 1975 indicate the absence of any contaminants, other than DIMP in 1975, in plaintiffs' water. Another test, conducted by Spectran Laboratories, Inc. in 1973, at Larry Land's request, concluded "[t]here is no evidence for the presence of insecticides, pesticides, or any other identifiable organic substances *whatsoever.*" The hearing officer, based on a review of all the evidence, found that plaintiffs did not meet their burden of proving, by a preponderance of the evidence, that their physical injuries and the loss of their cattle were caused by contaminants in the groundwater which emanated from the Arsenal.

Plaintiffs' circumstantial proof that their injuries were caused by contaminants from the Arsenal other than DIMP is based on speculation that because DIMP migrated to Larry Land's well, other chemicals placed into the basins at the Arsenal could have and *did migrate to* plaintiffs' wells. At trial, plaintiffs' used a generalized *post hoc ergo propter hoc* (after this therefore on account of this) approach to prove causation, i.e., the cattle drank the water, the cattle died, there-

fore the water was poisoned. That approach was inadequate. *Baskett v. United States,* 8 Cl.Ct. 201, 211 (1985) (*"Post hoc ergo propter hoc* is neither good logic nor good law.") (citing *Volentine and Littleton v. United States,* 144 Ct.Cl. 723, 726, 169 F.Supp. 263–265 (1959). *See Renaud,* 749 F.Supp. at 1553 ("Mere possibilities or conjecture cannot establish a probability.") (citing *In re Swine Flu,* 495 F.Supp. at 1206; *O'Connor v. Boulder Colorado Sanitarium Ass'n,* 107 Colo. 290, 111 P.2d 633, 634–35 (1941)).

## B. Property Damage Claims

Plaintiffs argue that the hearing officer ignored the circumstantial evidence submitted at trial and wrongly concluded that the proximate cause of death of the cattle was from shipping fever. There was disagreement at trial about how many cattle became sick, the age of the cattle, and where the affected cattle came from. The hearing officer stated:

> Mr. Land claimed on the witness stand that several hundred adult cattle also died during the spring of 1972, putatively due to the same poisoning that infected the calves. The documentary evidence, however, confirms only the figure of 144 calf losses. Plaintiffs' first amended complaint states that half of 520 calves and yearlings were lost, but plaintiffs' evidence likewise fails to substantiate that figure. For the purpose of this Report, the court shall disregard plaintiffs' testimony concerning lost cattle other than the 144 calves because those losses are unsubstantiated by contemporaneous evidence. Admittedly, of course, even the figure of 144 is somewhat tenuous because the only contemporaneous source for that figure is a statement attributed to Mr. Land in June 1972 when he brought three calves in for clinical study at Colorado State University. Nonetheless, the court shall accept the figure of 144 as correct.

*Land,* 35 Fed.Cl. at 347 n. 1.[6]

Plaintiffs argue that the hearing officer "found an absence of proof of causation based solely upon the results of the 1975 DIMP tests because of the absence of specific tests for other toxic compounds in plaintiffs' water causing illness to the plaintiffs and illness and death to their cattle." Plaintiffs distort the findings of the hearing officer. First, with regards to the illness and death of plaintiffs' cattle, the hearing officer found that "the preponderance of evidence weighs heavily against plaintiffs' contention that they died from groundwater poisoning." *Land,* 35 Fed.Cl. at 349. The hearing officer did not ignore plaintiffs' evidence, he found that on balance, defendant's evidence was more persuasive than plaintiffs'. Specifically, the hearing officer took into account the conditions under which the calves were purchased and transported to Larry Land's farm and the expected high rate of death and disease among young calves under such conditions and concluded that it was more likely than not that the cattle died from causes other than poisoning. *Id.* Moreover, the use of the word "poisoning" instead of "DIMP poisoning" indicates that the hearing officer considered plaintiffs' claims of illness and death from exposure to other contaminants.

Plaintiffs contend that "the presence of DIMP in any amount is as material as finding a fingerprint at the scene of a murder. It conclusively establishes the source of some, if not all, of the pollutants." The hearing officer found that DIMP was the only Arsenal-related substance that has ever been detected in Larry Land's well water. *Land,* 35 Fed.Cl. at 351. Dr. Waddell's testimony, plaintiffs' expert in hydrology, supports this conclusion. Dr. Waddell testified that there was no data from which he could to conclude to a reasonable degree of scientific certainty that the presence of any chemical other than DIMP was found in the groundwater beneath the Arsenal, offpost of the Arsenal, and in any of the plaintiffs' groundwater. Tr. 380:16–381:11.[7] Our ex-

---

6. At oral argument plaintiffs' counsel stated that there are receipts which corroborate plaintiffs' claim of the number of lost cattle. Those receipts, however, were never submitted in evidence and, therefore, are not part of the record.

7. Dr. Waddell also testified that "one of the difficulties that I had with working with Mr. McClaren [plaintiffs' counsel] was his telling me what he wanted my testimony to be.... And, you know, I did have some difficulties ... that Mr. McClar-

amination of the record before the hearing officer does not establish that the hearing officer failed to analyze the materials in the record, or that the findings of fact are clearly erroneous. The hearing officer's report discusses Dr. Gavin Meerdink's testimony, defendant's veterinary expert, whose scientific opinion was that exposure to DIMP could not have caused the death of plaintiffs' cattle. The hearing officer explained:

> The scientific basis for Dr. Meerdink's opinion as to the cause of the calves' death is unrebutted. Plaintiffs rely primarily on the deeply felt conviction of their own veterinary expert, Dr. Scott, that the cause of the calves' illness must have been some contamination in the water. Dr. Scott's opinion, in short, is visceral, not scientific. He did have the advantage of observing and necropsying Mr. Land's calves in the course of his practice. His recollections of these observations, however, are of little value because, in formulating his opinion, Dr. Scott disregarded or discounted the scientific evidence of DIMP's toxicity that has been developed in the years since those deaths occurred. *DIMP, it must be emphasizes, is the only Arsenal-related substance that has ever been detected in Mr. Land's well water.*

*Land,* 35 Fed.Cl. at 351 (emphasis added). No competent evidence in the record shows that DIMP or any other chemical caused the symptoms that afflicted plaintiffs' cattle. It is apparent that the hearing officer considered and rejected plaintiffs' arguments in support of such finding of fact.

### C. Plaintiffs' Physical Injuries

Dr. Teitelbaum, plaintiffs' toxicologist, attempted to connect plaintiffs alleged personal injuries with the water contamination. The hearing officer dismissed Dr. Teitelbaum's testimony in a footnote. The hearing officer stated:

> [Dr. Teitelbaum's] "preliminary" medical opinion that plaintiffs' injuries were probably caused by DIMP poisoning is of little value because Dr. Teitelbaum did not conduct physical examinations of the plaintiffs. Such examinations, Dr. Teitelbaum admit-

en was trying to draw my conclusions for me.

ted, would be necessary in order for him to form a conclusive opinion about the cause of plaintiffs' injuries. On that basis, the court can accord no weight to Dr. Teitelbaum's medical opinion about the cause of plaintiffs' injuries.

*Land,* 35 Fed.Cl. at 352, n. 7. Plaintiffs failed to persuade the hearing officer of the existence of their alleged physical injuries primarily because Larry Land's testimony concerning those injuries was uncorroborated by contemporaneous medical records. *Id.* at 351. Impinging on Larry Land's credibility was evidence that he consistently represented to doctors, insurers, and employers that he was healthy. One instance that the hearing officer referred to took place in February 1984 when Larry Land applied for a job with the sheriff's department in Washington County, Minnesota. In his medical history questionnaire, Larry Land answered "no" when asked if he had ever suffered any of 44 different symptoms, including headaches and dizziness. Moreover, Mr. Land was given the opportunity to list any other illnesses he has suffered from that were not listed. He listed that he suffered from several ear infections but did not mention his alleged exposure to chemical poisoning.

### 3. Plaintiffs' Remaining Contentions

■ In plaintiffs' opening brief they attempt to establish, for the first time, that the Colorado standard for DIMP is 8 ppb (parts per billion). Plaintiffs did not introduce any evidence of this standard at trial or in their posttrial brief. At trial, defendant presented testimony and expert reports indicating that the federal Environmental Protection Agency (EPA) DIMP Health Advisory of 600 ppb reflected a level for lifetime daily consumption of DIMP below which there would be no adverse health effects on humans. The record shows that plaintiffs did not challenge the accuracy or the adequacy of the EPA standard on cross-examination. Plaintiffs made passing reference to the Colorado DIMP standard during their cross-examination of Dr. Benson. The extent of the testimony on the Colorado standard was as follows:

And I resisted that." Tr. 389:23–390:8.

 

Q: How about the Colorado Department of Health, did they—did they work on the standard on DIMP?

A: The State of Colorado does have a standard, a statewide standard for DIMP.

Q: Is it different than the EPA standard?

A: Yes, it is.

Tr. 671:16–21. Plaintiffs offered no further evidence on the Colorado standard at trial or in their posttrial brief. An appellate court generally will consider only issues presented to the district court. *L.E.A. Dynatech, Inc. v. Allina,* 49 F.3d 1527, 1531 (Fed.Cir.1995). As this Panel acts as an appellate court, it generally will only consider issues presented to the hearing officer. Moreover, the Colorado regulations setting forth the 8 ppb standard for DIMP does not create, as plaintiffs aver, a presumption of injury due to exposure in excess of 8 ppb. The Water Quality Control Commission which adopted the 8 ppb standard "intends for its standards to be used as cleanup standards." 5 Colo.Code Regs. § 1002–8 (1994).

■ Finally, we address what is essentially plaintiffs' thinly veiled request for a new trial or motion to amend findings. Generally, "[a] party who failed to prove his strongest case is not entitled to a second opportunity by moving to amend a finding of fact or a conclusion of law." 9 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2582 at 722 (1971); *see Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1220 (5th Cir.1986) ("Blessed with the acuity of hindsight, [plaintiffs'] may now realize that it did not make its initial case as compelling as it might have, but it cannot charge the [hearing officer] with responsibility for that failure through [a motion to amend]."). Further, a new trial is not intended to secure a forum for relitigation of old matters or to afford parties an opportunity to present their case under new theories. *Rosera v. Int'l Harvester Co.,* 109 F.R.D. 143, 148–49 (E.D.Wis. 1986).

## CONCLUSION

For the reasons stated in this report, the Review Panel recommends that the Chief Judge advise the House of Representatives that plaintiffs do not have a legal or equitable claim against the United States and that any award to plaintiffs on the facts present in the record before the Review Panel would be a gratuity.